1 (Pages 1 to 4)

### Page 1

```
 1  UNITED STATES DISTRICT COURT FOR
 2       THE DISTRICT OF COLUMBIA
 3  - - - - - - - - - - - - - - - x
    JONATHAN W. RUDE,            :
 4       Plaintiff,  :
    vs.                          : Case No.
 5                               : 1:05cv1278RCL
    DANCING CRAB @ WASHINGTON    :
 6  HARBOUR, et al.,             :
         Defendants.  :
 7  - - - - - - - - - - - - - - - x
 8            Vienna, Virginia
 9            Thursday, June 22, 2006
10
11     Deposition of CHARLES MORAN, a witness,
12  called for examination by counsel for plaintiff,
13  pursuant to notice, at the offices of L.A.D.
14  Reporting Services, 8484 Westpark Drive, Suite
15  110, McLean, Virginia 22102, before Sandria L.
16  Cox, a notary public in and for the Commonwealth
17  of Virginia, beginning at 1:30 p.m., when were
18  present on behalf of the respective parties:
19
20
21  Job No.: 4-81128
22  Pages: 1-36
```

### Page 2

```
 1  APPEARANCES:
 2
 3     FOR THE PLAINTIFF:
 4     RICK A. RUDE, ESQUIRE
 5     Law Offices of Rick Rude
 6     207 Park Avenue
 7     Falls Church, Virginia 22046
 8     703-536-3063
 9
10     FOR THE DEFENDANTS:
11     RICHARD R. PAGE WYROUGH, ESQUIRE
12     Cain & Wyrough
13     15051 Marlboro Pike
14     Upper Marlboro, Maryland 20772
15     301-627-4600
16
17
18
19  Also Present: Gregory Casten
20
21
22
```

### Page 3

```
 1                 I-N-D-E-X
 2            EXAMINATION BY COUNSEL FOR
 3            PLAINTIFF.
 4  WITNESS          MR. RUDE:
 5  Charles Moran        4
 6
 7
 8
 9
10
11
12
13            E-X-H-I-B-I-T-S
14
15  MORAN EXHIBIT
16  No. 1 (Moran statement)            9
17  No. 2 (Handwritten statements)     28
18
19
20
21
22
```

### Page 4

```
 1           P-R-O-C-E-E-D-I-N-G-S
 2        Whereupon,
 3        CHARLES MORAN,
 4  a witness, was called for examination by counsel
 5  for plaintiff, and, after having been first duly
 6  sworn, was examined and testified as follows:
 7        EXAMINATION BY COUNSEL FOR PLAINTIFF
 8        BY MR. RUDE:
 9     Q. Please state your full name and home
10  address.
11     A. Charles Lawrence Moran; 4814 Nebraska
12  Avenue, Northwest, Washington, D.C. 20116.
13     Q. Do you have a telephone number?
14     A. 202-680-0242.
15     Q. Do you have a cellphone?
16     A. That's it.
17     Q. What is your marital status?
18     A. Single.
19     Q. Are you presently employed?
20     A. No. I'm interning.
21     Q. Where are you interning?
22     A. Merrill Lynch.
```

**13**

1  Olayinka Adeboyeku -- we'll refer to him as
2  "Yinka" -- and John Cummings?
3     A. I recall an incident that occurred
4  between Yinka and a couple of the other people
5  that were down at the lower-hand-side of
6  Riverside.
7     Q. Okay. Can you identify who the other
8  people were?
9     A. Well, when I got there, which I don't
10 know -- it could have been a few minutes into
11 what transpired -- there were about five people,
12 four people that were non-employees, one of
13 which I know was John Cummings.
14        I didn't know at that point -- I did
15 not know John Rude by face, but I later found
16 out that that was someone who was there. But I
17 personally did not recognize him or see him.
18 The other two or three I didn't know.
19    Q. Okay. What was transpiring?
20    A. What I arrived, John Eagleton was at
21 the door, and when I arrived, there were two or
22 three bouncers, which is not uncommon for two

**14**

1  bounces-three bouncers to be working a door at a
2  time, and it was kind of like a half-circle of
3  people who were not working.
4        And when I arrived, there were people
5  talking back and forth and I asked what was
6  going on. And at that point I witnessed someone
7  reach around and pat Yinka on the back of the
8  head.
9        Yinka appeared to be upset. He
10 didn't do anything. Didn't touch anything.
11 Nothing transpired.
12       So at that point John, I and I
13 believe Dean was there, decided that we needed
14 to break this up because we needed to get back
15 to the normal business and nothing good could
16 have come from the situation.
17       So John Eagleton, I believe, was the
18 one that said, "You guys need to leave and do
19 not come back."
20       And at that point they walked over
21 across from the fountain. And I don't remember
22 which one of us -- I believe it was John -- told

**15**

1  Yinka to "Go into Riverside and cool down and
2  we'll take care of the rest."
3     Q. Yinka was upset?
4     A. Uh, not visibly at that point. He
5  wasn't saying much. He was just quiet.
6     Q. Just so the record is clear here, you
7  did not see how this incident started?
8     A. No. I did not see --. I came upon
9  the group of people and I don't know how long
10 they had been standing there. I don't know how
11 anything started.
12    Q. Was John Eagleton already there when
13 you got there?
14    A. When I got there, John was either
15 just arriving or had been there for a minute.
16    Q. Had John Eagleton -- what was John
17 Eagleton doing?
18    A. I'm in between the groups of people.
19 I was standing in between the two groups of
20 people and John was standing on the side and
21 John was speaking more toward the other side and
22 I was just standing to make sure that everyone

**16**

1  was still calm, cool and collected and I really
2  wasn't paying too much attention to John at that
3  point.
4     Q. So he was speaking toward the
5  individuals that were with John Cummings?
6     A  Yes.
7     Q. And he had his back to Yinka?
8     A. You know, I don't remember whether he
9  had his back to Yinka or not.
10    Q. I would like to direct your attention
11 to the bottom of the second paragraph where it
12 says "Ten minutes later Yinka came back."
13       Do you see that?
14    A  Yes. Okay. "Ten minutes later Yinka
15 came back."
16    Q. So Yinka was working as a doorman
17 that evening, was he?
18    A. Correct.
19    Q. And he was on duty?
20    A. At that point in time, yes.
21    Q. Do you know why he said he went to
22 the parking garage?

Page 17

1  A.  I didn't ask him, but when John had
2  told him to go into the office and cool down,
3  the office at Riverside is nextdoor to the back
4  entrance to the parking garage. So John had
5  just told him to go in and cool off.
6      So do I know what he was doing in the
7  parking garage or do I know why he went there?
8  No, I do not.
9  Q.  Did you later learn what had
10 transpired between Yinka and John Cummings
11 outside the parking gargage?
12 A.  I was told from Yinka what his side
13 of the story was, yes.
14 Q.  Did you relay that information to
15 anyone else?
16 A.  I believe that --.
17     Do I remember? No. But I would have
18 told the other managers.
19 Q.  And that would have been who else
20 that evening?
21 A.  For sure John Eagleton and Dean
22 Cibel.

Page 18

1  Q.  Was Yinka visibly upset or agitated?
2      MR. WYROUGH: Asked and answered. At
3  which point in time?
4      MR. RUDE: When he came back from the
5  parking garage.
6  A.  What was the question again, sir?
7      BY MR. RUDE:
8  Q.  Was he visibly upset or agitated when
9  he came back from the parking garage?
10 A.  When I saw him come back, I said
11 maybe a word to him, or two, because I saw that
12 he had had his shirt completely buttoned up to
13 the top, which is uncommon because it's a
14 colored shirt, and I asked him, "Are you okay?"
15     And that's at what point he said,
16 "This is what happened." And he wasn't yelling
17 or flailing his arms in any tone that made me
18 think that he was upset. But a brief
19 conversation with him.
20 Q.  Let's go to the following weekend,
21 which would have been Saturday night, the 26th,
22 and the morning of the 27th.

Page 19

1  Were you working that evening?
2  A   Yes, I was.
3  Q.  Do you recall the events of that
4  evening?
5  A.  Vaguely, yes, as much as I can.
6  Q.  Which establishment were you working
7  in?
8  A.  Again, that night I would have been
9  at Tony & Joe's and Riverside, floating.
10 Q.  Do you recall your trial testimony
11 from that evening?
12 A.  Vaguely, again.
13 Q.  Do you recall testifying that you
14 were at Tony & Joe's that evening?
15 A   Yes.
16 Q.  Let's go to approximately 1:30 in the
17 morning. What would your normal activity have
18 been about that time of the evening?
19 A.  It would be clearing the outside
20 patio of Tony & Joe's. And Riverside, if they
21 needed help.
22 Q.  There's an outside patio bar --

Page 20

1  A.  Correct.
2  Q.  -- and inside patio bar.
3  A.  Correct.
4  Q.  Which of these bar areas would have
5  been cleared first?
6  A.  The outside would have been cleared
7  first on some times, and other times we clear
8  them at the same time. It depends on the crowd,
9  how crowded it is outside, and it really depends
10 on how crowded it is inside.
11 Q.  Who hired you at Tony & Joe's?
12 A.  Dave Pera was the general manager at
13 the time.
14 Q.  Dave hired you?
15 A.  He's the one I went to and spoke to,
16 yes.
17 Q.  Did there come a time when you were
18 at the main bar at Tony & Joe's when you saw
19 Yinka standing at the main door?
20 A.  On that evening?
21 Q.  Yes.
22 A.  When I saw Yinka standing at the main

**Page 25**

1  Q. What were you told?
2  A. I was told that one of the police
3  officers said, "Yinka is very upset outside, and
4  if you would like us to escort you a different
5  way, we would be more than happy to."
6  Q. Did you hear what John Rude's
7  response was?
8  A. I don't remember hearing, but someone
9  told me that he said yes.
10 Q. Did you see them leave?
11 A. Yes. I watched them walk out the
12 back dining room.
13 Q. Did you see where Yinka went after
14 John Rude and the police officer walked out the
15 back door?
16 A. Yinka started at that walk up towards
17 the boardwalk, at which point one of the police
18 officers -- I believe it was Glen Luckett --
19 stayed there, and Yinka was kind of upset, and
20 at that point I started to walk back in and Glen
21 Luckett said, "You need to cool off," and I
22 didn't see Yinka do anything after that.

**Page 26**

1  Q. Let's go down to the last line
2  here --
3  A. Uh-huh.
4  Q. -- on this memo. It says "Once the
5  two officers came back." These two officers
6  would have been who?
7  A. Officer Luckett and Officer Owens.
8  Q. And I'm looking at this last sentence
9  that said "Yinka had disappeared along with
10 Tony."
11 A. Uh-huh.
12 Q. Can you put a timeframe on that?
13 A. I don't remember the time because I
14 was not standing outside the whole time.
15    Whichever officer escorted him, when
16 he came back, they wanted to talk to Yinka, and
17 at that point I looked around and didn't see
18 Yinka or Tony, but Tosin was standing on the
19 boardwalk, I believe.
20 Q. Did you see Yinka and Tony run
21 through the main bar?
22 A. No, I did not.

**Page 27**

1  Q. Was there any discussion of the
2  events of that evening at Tony & Joe's after
3  this memorandum was prepared?
4  A. Well, when the Metropolitan police
5  officer came into Tony & Joe's looking for Tony
6  Wood's number, that was the only discussion of
7  Tony Wood or Yinka for the remainder of that
8  evening.
9  Q. What about subsequent to that
10 evening?
11 A. After that night what had been said?
12 Q. Uh-huh.
13 A. Yeah, I don't remember. I know that
14 I had heard what had happened. But that was --
15 I don't remember specific conversations at all.
16 Q. Were you in the main bar area at the
17 same time Robert Puzio was?
18 A. I don't remember.
19    MR. WYROUGH: Other than what he's
20 already testified to?
21    MR. RUDE: Right.
22    MR. WYROUGH: Go ahead.

**Page 28**

1  A. I don't remember.
2     BY MR. RUDE:
3  Q. Was there an occasion in July when
4  you spoke with Yinka?
5  A. There was an occasion in July where
6  Yinka had approached Dean Cibel and I and had
7  said a few things.
8     (The handwritten statements were
9     marked collectively as Exhibit No. 2
10    for identification.)
11 Q. I'm going to hand you a document, Mr.
12 Moran, and ask you to take a look at it.
13 A. (Reading).
14 Q. I'm going to ask you to review this
15 document. It's a statement by Dean Cibel. And
16 I'm going to ask you if you agree with what is
17 in this statement or disagree.
18 A. Just the front page?
19 Q. Yes. For now just the front page.
20    MR. WYROUGH: Objection to the (word)
21 of the question. Go ahead.
22 A. Yes, I would agree with this.