```
 1   you know, with -- the customer's been over served, to
 2   kindly escort them out or ask them to leave.  And then at
 3   the end of the night, you know, just kind of clean up a
 4   little bit.  When the bar closes down, get everyone to
 5   leave and that was -- that's pretty much it.
 6       Q    At what time did Tony & Joe's close?
 7       A    The outside bar would close before the inside
 8   bar.  And I believe it was 2:00 closure because we were in
 9   the waterfront area.
10       Q    Was it a normal practice that there were people
11   still inside the main bar when the outside bar was being
12   closed?
13       A    We closed the outside bar first and sweep all the
14   people out.  "Sweep" as in just, you know, "Bar's closed.
15   Everyone has to leave."  And then once that crowd
16   dispersed, we'd go clear everyone from the inside bar out,
17   excluding rides home, friends.  But that wasn't an every
18   night.  That was just sometimes.
19       Q    Was it a normal occurrence for people to be
20   allowed to stay in the main bar after 2:00 a.m.?
21       A    Yes.
22       Q    Under what circumstances would these individuals
23   be allowed to stay?
24       A    If it was a friend of the management or one of
25   the senior employees, like if it was one of the bartenders
```

1  who had been there for a couple years, or if it was
2  someone's ride home, or on the rare occasion, you know,
3  the bartender was trying to take a girl home or something.
4     Q    About what time would those people be gone from
5  the inside bar?
6     A    For the most part, the door staff would, you
7  know, get an end-of-the-night brief, have a beer, and then
8  head out. So if we got everyone out of the bar by 2:15,
9  probably by 2:30 everyone would be gone.
10    Q    All right. I'm going to take you to the evening
11 of June 19th, June 20th, 2004.
12         Do you recall whether or not you were working?
13    A    Yes.
14    Q    Did you see an incident between an individual by
15 the name of John Cummings and another individual of the
16 name of Olayinka Adeboyeku?
17    A    Yes.
18    Q    Can you state for the record what you saw that
19 evening?
20    A    Let me see. That was that night I came up, the
21 two of them were standing in front of Nick's Riverside
22 Grill, and they were arguing, but not -- it wasn't an
23 overly heated argument, that I remember. And I tried to
24 step in between them. At that point they both kind of, I
25 don't know, just told me to let it alone. So I walked

1  away at that point.

2  Q  Did you hear anything about that incident later
3  from anyone at Tony & Joe's?

4  A  Later that night I heard that Yenka had waited
5  for John Cummings and Jon Rude in front of the parking
6  garage and then tried to attack John Cummings while he was
7  sitting in the passenger seat of Jon Rude's car.  And when
8  I saw Yenka later that night, he mentioned that he had --
9  he had John Cummings' address, where he lived.

10  Q  Do you have any idea why Yenka would have John
11  Cummings' address?

12  A  I assume it was because he was going to go find
13  him after work.

14  Q  All right.  Do you know an individual by the name
15  of Tony Wood?

16  A  Yes.

17  Q  Who is he?

18  A  Tony Wood was another bouncer at the bar.

19  Q  Can you describe Tony Wood, for the record.

20  A  He was a little under six feet, heavyset but not
21  fat, like a solid muscular build.  He looked Samoan, but I
22  think he was half Chinese, half African American.

23  Q  Okay.  Did you have any conversations with Tony
24  Wood about the incident on the 20th of June?

25  A  I don't remember.

SHELBURNE SHERR COURT REPORTERS (619) 234-9100

10

1     Q    Okay.

2     A    I'm not sure.

3     Q    All right.  Let's go to --

4          MR. WYROUGH:  Keep your voice up, please.

5          THE WITNESS:  Yes, sorry.

6          MR. RUDE:  All right.  Can you hear?

7          MR. WYROUGH:  I can.

8          MR. RUDE:  Okay.

9  BY MR. RUDE:

10    Q    Mr. Sylvester, let's go to the following weekend,
11 which would be the weekend of June 26th-27th, 2004.

12         Were you working that weekend?

13    A    Yes.

14    Q    Do you recall seeing anything out of the ordinary
15 occur at Tony & Joe's that weekend?

16    A    Well, that night, at the end of the night, Jon
17 Rude was there and asked if I wanted a ride home.  I
18 declined it because I was finishing stocking the beer
19 coolers.  But my roommate at the time, Mike Gillman, who
20 was also roommates with Jon, we were all roommates,
21 accepted the ride home.  So I brought Jon into the main
22 bar to wait to give us a ride home -- or to give Mike a
23 ride home.  At which point I believe Rob Puzio approached
24 me and said that, you know, Jon couldn't be here because
25 of Yenka, and at which point I told Jon that he had to go.

1    A    I assume the management would have let me know.

2    Q    All right. So on the night of the 26th and 27th
3 when Jon Rude came back, is it your recollection that Rob
4 Puzio did not tell you that Jon Rude was not supposed to
5 be there?

6         MR. RUDE: I object to the form. It's a double
7 negative.

8         MR. WYROUGH: All right. Well, I'll ask it a
9 different way, Mr. Sylvester.

10 BY MR. WYROUGH:

11   Q    Did Rob Puzio tell you the night that Jon Rude
12 came back on the 26th and 27th that he was not supposed to
13 be there?

14   A    He said that Yenka was mad and that he shouldn't
15 be there. But he didn't say anything about his being
16 banned.

17   Q    All right. Well, did he also indicate that Jon
18 Rude knew he was not supposed to be there?

19   A    No.

20   Q    He did not?

21   A    No, he did not.

22   Q    All right. So he just -- but he did tell you
23 that Jon Rude was not supposed to be there; is that
24 correct?

25   A    He asked me to ask him to leave.

1    Q    Did he tell you that Jon Rude was not supposed to
2    be there at the time he asked you to ask him to leave?
3    A    No.
4    Q    He did not?
5    A    He just said Yenka was upset and Yenka was mad,
6    so could you ask him to leave.
7    Q    All right. And when he left, was he escorted off
8    the premises by an off-duty metropolitan police officer?
9    A    I'm not sure when they left. I believe I was
10   told that he left with Officer Rob Owen.
11   Q    Do you know why it was that Officer Rob Owen left
12   with them?
13   A    From what I was told, it -- once I'd asked Jon to
14   leave, Jon and Rob Owen began talking about Yenka being
15   mad and that situation, that Jon was willing to talk to
16   him. And Officer Owen told him "Don't even do that." And
17   then from what I was told, they walked out the back door
18   of the restaurant, around Sequoia towards the east part --
19   toward the east up to K Street. And then at that point
20   Officer Owen asked Jon if he wanted him to walk him to his
21   car, and Jon said no.
22   Q    Who told you that?
23   A    I believe Mike Gillman told me.
24   Q    All right. So who else was with Jon Rude and
25   Mike Gillman when they left the premises?

1   When he and Officer Rob Owen got into a
2   conversation about that situation, I went into the back to
3   get beer coolers. When I came back, they were gone.
4   Yenka came running through from the back restaurant into
5   the bar, stopped, turned to me and said he hated us
6   Georgetown kids. He's going to go knock Jon out and come
7   back and knock me the fuck out. And then he took out the
8   door, at which point Tony Wood turned and said to me
9   something to the effect of, you know, I got it. Don't
10  worry about it. And then he took off running out the door
11  after Yenka.
12      I was confused at the whole situation. I didn't
13  know what was going on. I went back to filling beer
14  coolers. A little while later -- I don't remember how
15  long -- Tony Wood came in, talked to me about how Yenka
16  and Jon got into a fight, and Mike Gillman shouldn't have
17  choked Yenka. And then a little while later police
18  officers showed up and I left shortly after that.
19  Q    Okay. Did you subsequently have any
20  conversations with anyone at Tony & Joe's regarding that
21  incident?
22  A    The next night, which was a Sunday, I found out
23  the severity of the situation and I got permission to
24  go -- to leave work to go see Jon at the hospital. When I
25  came back, Chuck asked me about how Jon was and how -- and

1  a different -- a different day. I thought the 27th was a
2  Sunday. The night he returned from that night after they
3  left the bar, I remember him saying that Jon got beat up
4  and that Mike shouldn't have gotten involved.
5     Q    Now, when you say they left the bar, were they
6  walking or running?
7     A    Yenka said he was going to knock me out, then he
8  ran out the door. Tony said -- said something to me to
9  the effect of "I've got it," and then he ran out the door
10 after him.
11    Q    Mr. Sylvester, do you know what the term
12 "banning" means?
13    A    Yes.
14    Q    What is that?
15    A    Being forbidden to return.
16    Q    Was Jon Rude banned from Tony & Joe'?
17    A    No.
18    Q    Was he banned from Nick's Riverside Grill?
19    A    No.
20    Q    Did you have any conversations with anyone at
21 Tony & Joe's during the week of June 20th through the 27th
22 regarding the incidents that occurred on June 20th?
23    A    Not that I can think of.
24         MR. RUDE: I have nothing further.
25         Mr. Wyrough?

1    A    I was threatened by Yenka.

2    Q    And what did he threaten to do?

3    A    The night of the 26th he threatened to knock me
4 out and then I was told later that he had threatened to
5 shoot me.

6    Q    And were you told why he intended to shoot you?

7    A    He threatened to shoot me because I was
8 recruiting people to testify against him in court.

9    Q    And that would have been in relation to his
10 assault charge against -- in the U.S. Superior Court?

11   A    Yes.

12   Q    I'm going to show you what's marked as
13 Plaintiff's Exhibit No. 3.  This is the -- Mr. Wyrough,
14 this is the Oceanside Management Employee Manual?

15        MR. WYROUGH:  Right.

16        (Plaintiff's Exhibit No. 3 was marked.)

17 BY MR. RUDE:

18   Q    Mr. Sylvester, I'm going to show you a seven-page
19 document and I'm going to ask you if you've ever seen that
20 before?

21   A    The manual, yes.

22   Q    Okay.  I'm going to ask -- I'm going to direct
23 your attention to page 6, if you would.  It's a seven-page
24 document.

25        Do you have that in front of you?

SHELBURNE SHERR COURT REPORTERS (619) 234-9100

39

1   STATE OF CALIFORNIA

2

3   COUNTY OF SAN DIEGO

4

5       I, Paula A. Rahn, Certified Shorthand Reporter, in and for the State of California, Certificate No. 11510, and Registered Professional Reporter, do hereby certify:

6

7       That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me on Tuesday, June 27, 2006, at 5963 La Place Court, Suite 306, Carlsbad, California; that said deposition was reported by me in shorthand and transcribed, through computer-aided transcription, under my direction; and that the above and foregoing pages, numbered 4 to 44, inclusive, is a true record of the testimony elicited and proceedings had at said deposition.

13      I do further certify that I am a disinterested person and am in no way interested in the outcome of this action or connected with or related to any of the parties in this action or to their respective counsel.

16      In witness whereof, I have hereunto set my hand this 5th day of July 2006.

*[signature: Paula Rahn]*

Paula A. Rahn, RPR, CSR No. 11510