1

```
              UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF COLUMBIA
    ----------------------------------------+
    JONATHAN W. RUDE                         |
           Plaintiff,                        |
                                             |Case No.:
    v.                                       |1:05cv1278RCL
                                             |
    DANCING CRAB AT WASHINGTON               |
    HARBOUR, ET AL                           |
           Defendant.                        |
    ----------------------------------------+
```

**ORIGINAL**

Deposition of JONATHAN Q. EAGLETON

McLean, Virginia

Thursday, July 6, 2006

10:00 a.m.

Job No.: 4-81129

Pages 1 - 81

Reported by Janie Arriaga



DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

16

1    A    I got my degree from Gettysburg College in
2 Pennsylvania.
3    Q    What is your degree in?
4    A    Small business management.
5    Q    And when did you graduate?
6    A    December '97, I believe.
7    Q    Going to Tony and Joe's Seafood Place; did you
8 ever work for Tony and Joe's Seafood Place?
9    A    No.
10   Q    Who hired you at Nick's Riverside Grill?
11   A    Greg Caston.
12   Q    And when were you hired there?
13   A    Again, I think it was in 2001, in either June
14 or July.
15   Q    Have you held any other positions at Nick's
16 Riverside Grill than general manager?
17   A    No.
18   Q    Who do you report to as the general manager of
19 Nick's Riverside Grill?
20   A    Greg Caston.
21   Q    Do you know who he reports to?
22   A    No.

22

1    A    Because the inside is a restaurant, so you're
2 only having someone there to monitor drinks and anyone
3 that might be walking into the bar.  The outside area
4 has two entrances that's solely for the bar area.
5    Q    Is the fountain area part of Nick's Riverside
6 Grill?
7    A    By "fountain," meaning it's on that level?
8 There's two levels.
9    Q    Yes.
10    A    Yes, that is a part of Riverside Grill.
11    Q    The fountain area?
12    A    Well, the fountain walkway.  No, the fountain
13 isn't a part of Riverside Grill.
14    Q    The -- once you've left the threshold of the
15 main entrance, is that a public area or the leased
16 property of Nick's Riverside Grill?
17    A    It's a public area, private property.
18    Q    Would that be the same as Tony and Joe's side
19 of the fountain?
20    A    Yes.
21    Q    Have you ever heard of an establishment called
22 Cabana's?

1  approached, was patting him on the head saying, now that

2  everything was going to be okay, because I was

3  approaching. With Jon Rude by his side, I stepped

4  between the two individuals and let them know that they

5  weren't welcome at the Riverside Grill and Tony and

6  Joe's bar if they were going to continue to come down

7  and cause problems at the bar.

8      Q   When you stepped between them, were you facing

9  John Cummings?

10     A   Yes.

11     Q   With your back to Yinka?

12     A   Yes, John Cummings and Jon Rude.

13     Q   And what was Jon Rude doing?

14     A   Standing right besides John Cummings.

15     Q   Was he touching anyone?

16     A   No, he was laughing.

17     Q   Was he saying anything to anyone?

18     A   No, he was laughing.

19     Q   How long have you known Tosin and Yinka?

20     A   He's been working there my entire career at

21 Riverside.

22     Q   So he was there when you got there?

DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

51

```
 1   BY MR. RUDE:
 2       Q    Okay.  Did you see how the altercation started
 3   between John Cummings and Yinka?
 4       A    No.
 5            MR. CAIN:  I just -- can I you clarify
 6   something for me?
 7            MR. RUDE:  Sure.
 8            MR. CAIN:  He's described coming up and seeing
 9   someone patting someone on the head.  Is that what
10   you're describing as an altercation?
11            THE WITNESS:  Well, it's called an incident.
12            MR. CAIN:  You're talking about what he
13   described that he saw?
14            MR. RUDE:  That's right.  I'm asking if he saw
15   how it started.
16            THE WITNESS:  No.
17   BY MR. RUDE:
18       Q    So you don't know whether or not Yinka had
19   patted John Cummings on the head; do you?
20       A    No.
21       Q    Do you recall what Yinka said to John
22   Cummings?
```

62

1   Dean Cibel.

2   Q   Did you ever hear Yinka state that he hated

3   Georgetown football players?

4   A   No.

5   Q   Do you know about the process of banning

6   Mr. Eagleton?

7   A   Somewhat.

8   Q   What is your understanding of that process?

9   A   In terms of banning?

10  Q   Uh-huh.

11  A   You need -- you can get the police involved

12  and take a photo and get their identification.

13  Depending on the severity of why you're getting them

14  barred, probably you would really have to go through the

15  motions of barring someone with a picture and whatnot.

16  Q   Are you talking about -- you used the word

17  "severity." Is it my understanding that there's a

18  distinction between asking someone to leave and banning

19  someone?

20  A   No.

21  MR. CAIN: Is banning and barring considered

22  synonymous, just for clarification?

63

1           MR. RUDE:  Yes.
2    BY MR. RUDE:
3        Q    So when you asked a customer to leave, they
4    are permanently barred from returning to your
5    restaurant?
6        A    No, I follow it up with, you're barred from
7    both Tony and Joe's, Riverside Grill, and Cabana's.
8        Q    And who established that policy?
9        A    That's just something that I've known to be
10   the procedure.
11       Q    And when did you first learn that?
12       A    In terms of the procedure?
13       Q    Uh-huh.
14       A    Never -- can't recall.
15       Q    So there's no particular procedures for
16   banning or barring customers?
17       A    No, there is -- I mean, there is with the
18   pictures, taking a photo, having a police officer take
19   down the information.
20       Q    What is the purpose of that?
21       A    To have -- to know who they exactly were in
22   case they came back.

DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

64

1   Q    To have a record; is that right?
2   A    No, to know who they were.
3   Q    And if they do come back, what is the
4   procedure?
5   A    To call the police into the situation and not
6   allow them back into the establishment.
7   Q    What occurs after you call the police?
8   A    They come and ask the people to leave or they
9   take a more formal -- a more formal record of who they
10  are.
11  Q    Is Nick's Riverside Grill a public
12  establishment?
13  A    I don't understand.
14  Q    Are you open to the public?
15  A    Yes.
16  Q    It's a public establishment?
17  A    Sure.
18  Q    Do you have a manager's license?
19  A    Yes, Alcohol Beverage Control Board.
20  Q    When did you procure that license?
21  A    It's renewed every two years.
22  Q    When was the last time you renewed that

DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

67

1  walked into with John Cummings and Jon Rude with Yinka,
2  I was in the middle of several large men, which, I felt,
3  were in a very heated situation, as I walked into the
4  middle of it.  So I let them know they were not
5  welcomed, they were not to come back, and that they were
6  barred; trying to defuse a possible situation.  There
7  were a large number of large men around me and I was
8  between the three in the middle.
9       Q    How many people all together were in this
10 group of individuals that you have just described?
11      A    When I first came on, maybe four or five, six
12 or seven; but by the end, with apparently Dean and Chuck
13 coming into the situation, again, I was focused on these
14 three large men in the middle and trying to separate
15 them and defuse the situation.  I wasn't looking at my
16 surroundings.  I was concentrating on these three men
17 that I just put myself in between.
18      Q    So exactly what did Jon Rude do to Yinka?
19      A    Jon Rude was standing next to John Cummings
20 laughing.
21      Q    And I'm going to ask you again, what did he do
22 to Yinka?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

68

1   A   Again, what I witnessed was Jon Rude standing
2   next to John Cummings laughing.
3   Q   Did you see Jon Rude do anything to Yinka?
4   A   No.
5   Q   Did you see him touch him?
6   A   No.
7   Q   Did you see him insult him?
8   A   If you call laughing -- again, that's the only
9   thing I saw him do, was laugh, was laughing next to John
10  Cummings.
11  Q   Let's go to the issue of closing.  What time
12  does Nick's Riverside Grill have for last call?
13  A   We can go as late as 1:30.
14  Q   And what time do you close?
15  A   We have everyone -- I like to have everyone
16  out of my Riverside Grill by 2:00 a.m., no later.
17  Q   Is there ever a situation where you have what
18  amounts to holdovers, people finishing their drinks?
19  A   No, everyone is out the door by 2:00 a.m. at
20  Nick's Riverside Grill.
21  Q   What about Tony and Joe's?
22  A   No idea.

DEPOSITION OF JONATHAN Q. EAGLETON
CONDUCTED ON THURSDAY, JULY 6, 2006

81

CERTIFICATE OF NOTARY PUBLIC

I, Anthony Delaglio, Notary Public, the office before whom JONATHAN Q. EAGLETON appeared, do hereby certify that the foregoing witness personally appeared before me and was duly sworn in by me.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 23rd day of July, 2006.

My commission expires: October 14, 2010.

*Janie Arriaga*

NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA